# CASES

## ARGUED AND DETERMINED

### IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

MURRAY et al. v. WILSON DISTILLING CO. et al.

(Circuit Court of Appeals, Fourth Circuit. September 15, 1908.)

No. 821.

1. COURTS—JURISDICTION OF FEDERAL COURTS—SUIT AGAINST STATE.

For a number of years a "State Dispensary," created by an act of the Legislature of South Carolina, conducted all of the liquor business within the state. February 16, 1907 (Sess. Laws 1907, p. 480, § 47), the Legislature abolished the dispensary, and on the same day passed an act (Sess. Laws 1907, p. 835, §§ 1, 3, 5), authorizing the Governor to appoint a commission of five members, to be known as the "State Dispensary Commission," whose duty it should be to close out the business of the dispensary by selling its property and collecting all debts due it; "and by paying from the proceeds all just liabilities at the earliest date practicable," and to pay into the state treasury "all surplus funds on hand after paying all liabilities." *Held*, that such commissioners were not officers of the state, performing for it any functions of government, but merely agents for converting the property of the dispensary into cash and paying its debts; that they held the fund realized therefrom as trustees for the benefit primarily of the creditors; and that a suit in a federal court by such creditors against them to have the amounts due determined and paid from the fund was not one against the state, of which the court was without jurisdiction under the eleventh constitutional amendment—the state having no interest, except in the surplus remaining after the debts were paid.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, § 844½.]

2. SAME—TRUSTS—EQUITY—JURISDICTION—ENFORCEMENT OF TRUST.

In such case the creditors could maintain a suit in equity to enforce the carrying out of the trust by the commission on its refusal to pay their claims from funds in its hands, and for an injunction and the appointment of a receiver in aid of such relief, and to such a suit the state was not a necessary party.

3. SAME — INJUNCTION — FEDERAL COURTS — STAYING PROCEEDINGS IN STATE COURT—"COURT."

The commission appointed under such authority does not constitute a "court," within the meaning of Rev. St. § 720 (U. S. Comp. St. 1901, p. 581), prohibiting the granting of injunctions by federal courts to stay proceedings in a state court.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 2, pp. 1672–1682; vol. 8, p. 7622.]

164 F.—1

4. SAME—FEDERAL COURTS—FOLLOWING STATE DECISIONS.

A federal court is not bound to follow a decision of the highest court of a state construing a state statute in a suit involving rights which previously accrued and for the protection of which relief had previously been granted on a different construction.

Appeal from the Circuit Court of the United States for the District of South Carolina, at Charleston.

For opinion below, see 161 Fed. 162.

In 1892 the South Carolina Legislature passed an act establishing what was called a "State Dispensary." Under the provisions of this act private individuals were forbidden to engage in either the manufacture or sale of intoxicating liquors of all kinds and the right to carry on the liquor business in the state of South Carolina was reserved to the state. The act provided for a board of control of the dispensary, consisting of the Governor, the Comptroller General, and Attorney General, and to this board was committed the duty of conducting and managing the State Dispensary. The business of the dispensary, under and by virtue of the act referred to, was inaugurated under the control of the agencies designated and became the only legalized method of dealing in intoxicating liquors within the state. Among other provisions of the act were that a state commissioner should be appointed by the Governor, and that said commissioner should turn over monthly to the Treasurer of the state the amount received from sales of liquors made by him, and the Treasurer was required to keep a separate account of said fund, and the commissioner was authorized, with the approval of the board of control, from time to time to draw warrants upon the funds in the hands of the Treasurer for the amounts necessary to pay the expenses incurred in conducting the business. It was also provided that in counties complying with the requirements of the act county dispensaries might be established, and these latter were required to buy supplies of liquor from the State Dispensary, and the State Dispensary was required to sell to the county dispensaries supplies and intoxicating liquors at a profit of not more than 50 per cent. At the outset there was appropriated by the state for the purpose of starting the dispensary system the sum of $50,000, which amount has since been repaid to the state from the dispensary receipts. In the year 1896 the board of control was changed, so that, instead of being constituted as above set forth, it was made to consist of five members, to be elected by the General Assembly, each of said members being required to give a bond in the sum of $10,000, and the control and management of the dispensary was conferred by law upon them. This board, as above stated, was required to furnish liquor to the county dispensers, and the latter were required to remit the net proceeds of the sale of liquor to the State Treasurer. All bills for the purchase of liquor were paid by the State Treasurer upon warrants drawn by the commissioner. Thus the sale of intoxicating liquors was conducted in South Carolina under the several acts of the Legislature of that state and by the machinery provided for the purchase of liquors by the commissioner under the direction of the board of control of the State Dispensary and sale of liquors by the State Dispensary to the county dispensers, who, in turn, sold and remitted the money arising from the sales to the State Treasurer; the expenses of operating the State Dispensary, together with all bills for spirits purchased, being paid by the State Treasurer from the dispensary fund, which was kept separate, upon warrants of the commissioner, approved by the board of control. By the acts of 1902 all net income derived by the state from the sale of liquors in the state under the dispensary law was required to be apportioned among the several counties of the state for the benefit of the common schools in proportion to the deficiencies existing in the counties, etc.; and the said acts further required that the directors of the State Dispensary should pay over to the State Treasurer by January 1, 1904, in equal semiannual payments, all of the school fund reported by them in excess of $400,000 for the benefit of the common schools of the state, to be apportioned as above stated. The business of the State Dispensary continued from the date of its estab-

lishment in 1892 until the year 1907, when the General Assembly of South Carolina passed an act entitled "An act to declare the law in reference to, and regulate the manufacture and sale, use, etc., of, liquors and beverages within the state and police the same." By section 47 of this statute it was enacted that the State Dispensary be abolished. This act was approved on the 16th day of February, 1907. Sess. Laws 1907, p. 480. At the same session of the Legislature another act was passed (Sess. Laws 1907, p. 835), which was approved on the same day as the last-named act, entitled "An act to provide for the disposition of all property connected with the State Dispensary and to wind up its affairs," which is as follows:

"Session Laws S. C. 1907.   No. 402.

"An act to provide for the disposition of all property connected with the State Dispensary, and to wind up its affairs.

"Section 1. Be it enacted by the General Assembly of the state of South Carolina, that immediately upon the approval of this act, the Governor shall appoint a commission of well-known business men, consisting of five members, none of whom shall be members of the General Assembly, to be known as the State Dispensary Commission, who shall each give bond for the faithful performance of the duties required, in the sum of $10,000.

"Sec. 2. Said commission shall immediately organize by the election of a chairman and a secretary from their number.

"Sec. 3. It shall be the duty of said commission to close out the entire business and property of the State Dispensary, except real estate, and including stock in the several county dispensaries by disposing of all goods and property connected therewith, by collecting all debts due and by paying from the proceeds thereof all just liabilities at the earliest date practicable. Said commission shall be at liberty to make such disposition upon such terms, times and conditions as their judgment may dictate: Provided, that no alcoholic liquors or beers shall be disposed of within the state except to county dispensary boards, and all liquors illegally bought by the present management may be returned to the persons, firms or corporations from whom purchased, and for determining the legality of said purchases, they are hereby authorized and directed to investigate fully the circumstances surrounding all contracts for liquors, and to employ such assistant counsel as may be approved by the Attorney General, and such expert accountants and stenographers and any other person or persons the commission may deem necessary for the ascertainment of any fact or facts connected with said State Dispensary and its management or control at any time in the past, and to take testimony, either within or without the state: Provided, further, that all payments shall be made in gold and silver coin of the United States, in United States currency, or in national bank notes.

"Sec. 4. The compensation of each member of said commission shall be $5 per day for each day actually employed about the business, and actual expenses for the time engaged: Provided, that they shall receive no compensation for services rendered on this commission after January 1, 1908.

"Sec. 5. The said commission shall pay to the State Treasurer, after deducting their compensation and other expenses allowed by this act, all surplus funds on hand after paying all liabilities.

"Sec. 6. The said commission is hereby authorized to employ such bookkeepers, accountants, clerks, assistants and employés as they may deem necessary, and to contract with them at the time of employment for their compensation.

"Sec. 7. The said commission shall submit to the Governor at the earliest day practicable, a complete inventory of all property received by them, with a statement of the liabilities of the State Dispensary, and as soon as the affairs are liquidated, a report in full of their actings and doings.

"Sec. 8. That said commission shall have full power and authority to investigate the past conduct of the affairs of the dispensary, and all the power and authority conferred upon the committee appointed to investigate the affairs of the dispensary, as prescribed by an act to provide for the investiga-

tion of the dispensary, approved January 24, A. D. 1906, be, and hereby is, conferred upon the commission provided for under this act: Provided, that for the purpose of the investigation of the affairs of the dispensary as herein provided, each and every member of said commission be, and hereby is, authorized and empowered, separately and individually, or collectively, to exercise the power and authority herein conferred upon the whole commission.

"Approved the 16th day of February, A. D. 1907."

By virtue of this act W. J. Murray, John McSween, B. F. Arthur, C. K. Henderson, and Avery Patton were duly appointed and qualified as commissioners, and they entered upon the discharge of their duties as such. They proceeded to sell the personal property and collect the debts due to the dispensary, and the State Treasurer of South Carolina paid over to them about $129,000 which he had in hand standing to the credit of the dispensary fund, and altogether, from the sale of the property, the collection of debts, and the amount paid over by the State Treasurer, there came to the hands of these commissioners about the sum of $800,000 to be administered by them under the provisions of the law above set out. The money thus realized from time to time, received by the defendants, who constitute the State Dispensary Commission, was, at the time of the commencement of this suit, in the hands of the commission or deposited in banks in the state of South Carolina, subject to the check of the commission, and no part of the said money is in the treasury of the state of South Carolina, or has been in any way mingled with the funds of the said state, but has been kept separate and apart in the hands of said commission, subject to its absolute control and disposition. The total amount of claims for liquors and supplies furnished, outstanding against the State Dispensary, was about $600,000, held by various corporations, partnerships, and persons, among whom were the original complainants and the several intervening complainants in this action. It further appears from the record that the complainants furnished to the defendants, at their request, itemized statements of their accounts against the State Dispensary, and the said accounts were, by comparison with the books kept by the dispensary, found to be in substantial agreement with said books. It further appears that the accounts of complainants were audited at the instance of the defendants and that the several amounts which are claimed were found to be correct.

As the several complainants and interveners in this action base their rights practically upon the same grounds, we will, in order to avoid confusion in the further presentation of the case, treat alone of the claim of the Fleischmann Company, one of the original complainants; the balance due said company being, as alleged, the sum of $66,501.10, which said claim, as before stated, was presented to the Dispensary Commission, was compared with the books kept by the State Dispensary, and also audited, as above stated, and found to be, as alleged, substantially correct. This complainant alleges further that this claim was duly presented to the Dispensary Commission, and payment thereof demanded, before the bringing of this action, and defendants refused to pay the same, or any part thereof. It further appears that at the time the defendants took charge of the affairs of the State Dispensary, to close them up under the provisions of the act of the Legislature, there was, among other liquors on hand, some of that which had been bought from the Fleischmann Company, and by agreement between the complainant and the commission this was returned to the complainants and credited on the claim of the latter. It also appears that other liquors and supplies for which the complainant the Fleischmann Company makes claim had been disposed of by the State Dispensary authorities, in the course of the operations of the dispensary, before the defendants in the present action took charge.

In order to give a full understanding of the questions presented, we set out the original bill filed by the Fleischmann Company, with the answer of the respondents thereto. This complainant afterwards filed an amended and supplemental bill; but it is not deemed necessary to set it out, as the original bill and return, or answer thereto, together with the statement of facts heretofore given, present clearly the questions to be considered.

Bill of complaint, filed January 23, 1908:

"In the Circuit Court of the United States for the District of South Carolina. Fourth Circuit, at Columbia.

"The Fleischmann Company, Complainant, v. W. J. Murray, John McSween, B. F. Arthur, C. K. Henderson, and Avery Patton, Constituting the State Dispensary Commission of South Carolina, and W. J. Murray, John Mc-Sween, B. F. Arthur, C. K. Henderson, and Avery Patton, Individually, Defendants. In Equity.

"To the Honorable Judges of the Circuit Court of the United States for the District of South Carolina:

"The Fleischmann Company, a corporation organized and existing under and by virtue of the laws of the state of Ohio, and a citizen of said state, brings this its bill against W. J. Murray, John McSween, B. F. Arthur, C. K. Henderson, and Avery Patton, constituting the State Dispensary Commission of the state of South Carolina, and said defendants individually, all of whom are citizens and residents of said state of South Carolina, and thereupon your orator complains and says:

"(1) That your orator, the Fleischmann Company, was at all times here-inafter mentioned, and still is, a corporation duly created, organized, and existing under and by virtue of the laws of the state of Ohio, and is a citizen and resident thereof, having its principal office in the city of Cincinnati, in said state, and that the defendant W. J. Murray is a citizen and resident of the state of South Carolina, residing at Columbia, in said state; the defendant John McSween is a citizen and resident of said state of South Carolina, residing at Timmonsville, in said state; the defendant B. F. Arthur is a citizen and a resident of the state of South Carolina, residing at Union, in said state; that the defendant C. K. Henderson is a citizen and resident of the state of South Carolina, residing at Aiken, in said state; and the defendant Avery Patton is a citizen and resident of the state of South Carolina, residing at Greenville, in said state.

"(2) And your orator further shows that many years prior to the passage of the act hereinafter mentioned there was duly created and established by law in the state of South Carolina an institution for the purpose of buying, sell-ing, and distributing alcoholic liquors within said state, known as the 'State Dispensary,' and that by the terms of the law creating and establishing said dispensary the managing agents or officers thereof were duly authorized, di rected, and empowered to purchase in its name and on its behalf all kinds of spirituous, vinous, and malt liquors, and to pledge the credit of the said State Dispensary for the payment of the same.

"(3) And your orator further shows that the General Assembly of the state of South Carolina, at its session held in the year 1907, for the purpose of discontinuing said State Dispensary, disposing of its assets, and paying off its creditors, passed an act entitled "An act to provide for the disposition of all property connected with the state dispensary and to wind up its affairs, which said act is in words and figures as follows: [The bill here sets out in full the act of the South Carolina Legislature of February 16, 1907, which is copied in the statement of facts hereinbefore.]

"(4) That the said act was duly approved on the 16th day of February, 1907, and within a short time thereafter the commission therein provided for was created by the appointment of the defendants as commissioners, and said defendants, having duly qualified and organized pursuant to said act, became and do now constitute the State Dispensary Commission, and as such are charged with the execution of all the powers conferred and the performance of all the duties imposed upon said commission by the said act.

"(5) That immediately upon their qualification and organization as herein-before alleged the defendants entered upon the discharge of said duties, and in accordance with the directions contained in said act took possession and con-trol of the entire business and property of the State Dispensary, and have, as your orator is informed and believes, sold said property and collected the debts due to said State Dispensary, and the proceeds arising from said sale and collection are, or ought to be, in the hands of said defendants, applicable

to the payment of the liabilities of said State Dispensary, and to the other uses and purposes designated in said act.

"(6) And your orator further shows that, prior to the passage of the said act of 1907, providing for a sale of the property of the said State Dispensary and the winding up of its affairs, and while the said State Dispensary was still engaged in business, your orator sold and delivered to it, at prices which were entirely reasonable and mutually satisfactory, a large quantity of valuable whiskies and other spirituous liquors, all of which whiskies and liquors were received and accepted by said State Dispensary, and had been, except as hereinafter alleged, sold or disposed of by it at a substantial profit; that the sales so made by your orator were in every respect regular and legal, and were made upon orders properly and lawfully given by the persons duly authorized to give such orders; and the whiskies were delivered to said State Dispensary under a contract, promise, and agreement that your orator should be paid the prices charged therefor, and the said State Dispensary became, and was at the time of the passage of said act, and at the time the defendants took charge of said business and property, and still is, justly indebted to your orator for the same.

"(7) That within a short time after the appointment and qualification of the defendants and their organization as the State Dispensary Commission your orator, being desirous of having its account against the State Dispensary settled, and in order that all differences might be reconciled, or disputes, if any, adjusted, and the amount due to your orator fixed and determined, filed with said defendants an itemized statement of its account, and requested the defendants to have the same audited, so that it could be passed upon; that thereafter the defendants notified your orator that there was still on hand and undisposed of a portion\ of the whisky which your orator had sold to the said State Dispensary, and asked your orator to take back said whisky and allow a credit therefor, then and there holding out as an inducement to your orator for so doing that if they were permitted to return said goods it would greatly facilitate a settlement with your orator, and enable them to make a much earlier payment of the account; and your orator, being anxious to remove every possible cause of delay in obtaining a settlement of its claim, did take back all of said goods and give credit therefor at the invoice price thereof.

"(8) That on or about the 24th day of May, 1907, the defendants advised your orator that, in comparing its account with the books kept by the State Dispensary, they had discovered a discrepancy between the amount claimed by your orator and the amount shown by said books to be due of $292.14, growing out of certain credits to which the said State Dispensary was entitled, and which your orator had failed to allow, but that in every other particular your orator's account was, according to the audit made by the defendants, correct, and corresponded with the said books, and that if your orator would allow said credit there would be no further dispute as to the amount due to your orator; and your orator, being still anxious to get its account adjusted and receive payment of the same, did consent that said sum might be deducted, and thereupon it was agreed between your orator and the defendants that there was on the date above mentioned a balance of $66,-501.19 justly due and owing to your orator by the said State Dispensary, which said sum the defendants then and there agreed to pay; but, notwithstanding your orator has made frequent demands on them, they have refused and still refuse to pay the same.

"(9) And your orator further shows that, as it is informed and believes, the defendants have received from the sale of the property of the State Dispensary and the collection of debts due it, and now have in their hands, a large sum of money, amounting to upwards of $800,000, and that this sum, if properly preserved and applied, will be amply sufficient to pay off and discharge the claim of your orator and all other just liabilities of said State Dispensary, which said liabilities do not, as your orator is informed and believes, exceed the sum of $609,000, all of which facts will more fully appear from the report made by the defendants to the Governor of the state of South Carolina on or about the 4th day of January, 1908, to which report reference is hereby made for the ascertainment of said amounts.

"(10) That, as your orator is advised and believes, the money received by the defendants and held by them as hereinbefore alleged, having been placed in their possession for the specific purpose of paying all the just liabilities of the State Dispensary, became and now constitutes a trust fund in the hands of said defendants, and the said defendants hold the same as trustees for your orator and the other creditors of the said State Dispensary, and, the amount due your orator having been determined and agreed upon, your orator is entitled to have said amount immediately paid to it out of said fund.

"(11) And your orator further shows that said defendants are abusing the trusts reposed in them by wrongfully and unlawfully failing and refusing to carry out the terms and provisions of said act of 1907 of the General Assembly of the state of South Carolina, and that the greater part of the money which the defendants have received as aforesaid has been on deposit for many months, and is now on deposit, in certain banks in the state of South Carolina, in which banks the said defendants, or some of them, are respectively interested, either as officers, stockholders, or directors; that a large sum of said money is now in the National Loan & Exchange Bank of Columbia, in which bank the defendant Murray, who is the chairman of the Dispensary Commission, is a large stockholder and a director; that another large portion of said money is deposited in the Bank of Timmonsville, in which said bank the defendant McSween is a stockholder and a director, and is also its president; that another large portion of said money is on deposit in the People's Bank of Union, in which bank the defendant Arthur is a stockholder and a director, and also its president; that another large portion of said money is on deposit in the Bank of Aiken, in which bank the defendant Henderson is a stockholder and director; that another portion of said money is deposited in the Piedmont Savings & Investment Company of Greenville, in which the defendant Patton is a stockholder and director; and a portion of said money is deposited in the Merchants' & Farmers' Bank of Cheraw, in which bank one W. F. Stevenson, who resides in the said town of Cheraw, and who is the attorney for the defendants constituting the State Dispensary Commission, is a stockholder and director, and also its president. That the said defendants have wrongfully, unlawfully, and fraudulently declined and refused to make distribution of the said money among the creditors of said State Dispensary, or to pay the claim of your orator, or any of the other of said creditors, for the reason, as your orator verily believes and alleges the fact to be, that there has been formed and now exists an unlawful understanding or agreement between the defendants, by which it has been decided that the money deposited in the banks above named shall be held and allowed to remain as long as possible in said banks and be used by them for their own benefit and profit.

"(12) And your orator further shows that there are a large number of persons claiming to be creditors of the said State Dispensary and seeking to collect from the defendants various sums, ranging in amount from one to many thousand dollars; that some of said persons, for the purpose of compelling the payment of their debts, have already brought suit against said defendants, and others are, as your orator is informed and believes, threatening to institute similar actions; and if the defendants shall be required or permitted to defend a multiplicity of such suits in order to determine the validity of each claim against them, and shall be allowed, as they have declared their intention to do, to defer the payment of all claims until the final termination of said suits, a large part of the funds in their hands will be wasted in expensive litigation and court costs, and a great wrong, injury, and injustice will be done to your orator and the other creditors, whose claims are admitted to be just and correct, and about which there is and can be no dispute.

"(13) And your orator further shows that, although the said defendants have in their hands the large sum of money hereinbefore mentioned, and although they are wrongfully and unlawfully retaining said money for the use and benefit of institutions in which they are personally interested, and are wrongfully and unlawfully refusing to carry out and perform the duties and trusts imposed upon them by the General Assembly of the state of South Carolina, the said defendants have only given bonds in the sum of $10,000 each, and they are now, as your orator is informed and believes, threatening to take measures to have an act passed by the General Assembly of South Caro-

lina terminating their commission and providing for a transfer of the money in their hands to the State Treasurer, which money ought to be applied to the payment of the debts due to your orator and the other creditors of the said State Dispensary, and thus, if possible, place the same beyond the reach, or by some other means, impair the contract rights, of your orator and said other creditors; and, as your orator is advised and believes, unless the defendants are restrained and enjoined from exercising any control over or in any way interfering further with said fund, the said defendants will waste or wrongfully divert the same, to the great and irreparable damage of your orator and all the other creditors of the State Dispensary.

"(14) And your orator further shows, upon information and belief, that there is a very wide difference between the opinions of the defendants as to the duties required of them as members of the Dispensary Commission, and the proper manner of performing said duties; that the defendant B. F. Arthur, although still a member of said commission, has declined and refused to take any further part in the proceedings thereof, and has not, for at least eight months, attended any of the meetings of said commission, or participated in any of its deliberations; that the other four defendants, as members of said commission, are about equally divided as to what course ought to be pursued with reference to the ascertainment of the just liabilities of the State Dispensary and the payment of the same, and that by reason of such division the said defendants have become engaged in a dispute among themselves, which renders it almost impossible for them ever to agree upon any plan by which to carry out the provisions of the act of 1907 of the General Assembly of South Carolina and to execute the trust imposed upon them by said act; and, as your orator is advised and believes, unless this honorable court shall take charge of the trust fund now in the hands of the defendants as members of said commission, and administer the same in accordance with the provisions of the said act of 1907, your orator and the other creditors of said State Dispensary will, to their great and irreparable damage, be indefinitely delayed in the collection of their claims.

"(15) And your orator further shows, upon information and belief, that the defendants now allege and pretend that there were certain irregularities and fraud in connection with some of the sales of liquors made to the former officers of the State Dispensary, and the defendants have entered into an un lawful combination or conspiracy with one J. Fraser Lyon, the present Attorney General of the state of South Carolina, and under whose advice said defendants are acting, to aid the said Lyon in carrying out his frequent threats to prosecute and imprison said officers, and to that end have agreed among themselves and with said Lyon to withhold the payment of the claim of your orator and all other creditors until the said Lyon has obtained such evidence as may be sufficient to prove the guilt and secure the conviction of said officers; that under and pursuant to this agreement, combination, or conspiracy the defendants have refused and are still refusing to carry out the provisions of the act of 1907, and to pay the claim of your orator and the other just liabilities of said State Dispensary, although the account of your orator has been duly audited, the amount claimed admitted to be justly due and payable as hereinbefore alleged, and notwithstanding the fact that the defendants have never made any pretense or claim that either of the sales made by your orator was in any respect irregular, illegal, or fraudulent, and notwithstanding the frequent promises and agreements by the defendants to pay the amount so admitted to be due.

"(16) And your orator further shows that, notwithstanding the fact that the amount claimed by your orator has been admitted by the defendants to be a just liability against the said State Dispensary, and now due and payable out of the fund in their hands, and although the said defendants have never claimed or pretended that said amount was subject to any offsets, credits, or counterclaims, your orator is ready, able, and willing, if this honorable court shall direct that the amount due to it be immediately paid, to execute and deliver to the said defendants a good and sufficient bond in such sum as may be required by this honorable court, to the full amount of its claim, if necessary, conditioned to pay to the said defendants all such amounts as may be, upon the hearing of this cause, found and adjudged to be due by

your orator to these defendants by way of offsets, reduction, credit, counterclaim, or otherwise.

"In consideration whereof, and forasmuch as your orator is without remedy and can obtain adequate relief only in a court of equity, and to the end that the defendants may be prevented from committing further wrongs and trespasses against the rights of your orator, and for the purpose of preserving the funds in the hands of the defendants and of enforcing the rights and equities of your orator in and to the same, and preventing further waste, loss, and damage, by reason of the facts alleged in this bill, your orator prays:

"(1) That this honorable court will either forthwith appoint a receiver to take charge of and administer as a trust fund all the money now in the hands of the defendants arising out of the sale of property belonging to the State Dispensary of South Carolina, or from the collection of debts due it, or direct and decree that the amount admitted to be due to your orator be immediately paid to it upon the execution by your orator of a good and sufficient bond, to be approved by the court and conditioned to pay to the defendants all such sum or sums as may be found to be due them by your orator and adjudged to be paid by it.

"(2) That the defendants, their agents, servants, attorneys, and employés be restrained and enjoined from disposing of or paying out, or in any manner interfering further with, said fund, or any part thereof, except to transfer the same to the receiver appointed by the court, or to pay the amount due to your orator, as the court may direct.

"(3) That it be referred to a master to ascertain and determine the amount due to your orator for goods sold and delivered by it to the said State Dispensary, and that a decree be entered ordering and directing that the amount so found to be due be immediately paid to your orator; that the defendants be required to set forth an account of all and every sum or sums of money received by them, or either of them, or which ought to have been received by them, or which has been received by any person or persons, by their or either of their orders, or for their or either of their use, from the sale of any property of the said State Dispensary, or the collection of any debt or debts due to it, and when and from whom, and from what in particular, all and every such sums were respectively received, and how the same respectively have been applied or disposed of; and that your orator have such other and further relief in the premises as the nature of the circumstances of this case may require, and as to the court may seem meet and proper.

"And may it please your honors to grant unto your orator a writ of injunction, conformable to the prayer of this bill, and also a writ of subpoena, directed to the said defendants, commanding them, and each of them, to appear and answer this bill of complaint, but not under oath, answer under oath being hereby expressly waived, and to stand to, perform, and abide by such orders, directions, and decrees in the premises as to the court shall seem meet or be required by the principles of equity and good conscience."

Return of defendants, filed January 29, 1908:

"In the Circuit Court of the United States for the District of South Carolina.

"The Fleischmann Company, Complainants, v. W. J. Murray et al., constituting the State Dispensary Commission of South Carolina, and W. J. Murray et al., Individually, Defendants. In Equity.

"Come now W. J. Murray, John McSween, B. F. Arthur, C. K. Henderson, and Avery Patton, constituting the State Dispensary Commission of South Carolina, and W. J. Murray, John McSween, B. F. Arthur, C. K. Henderson, and Avery Patton, and without submitting themselves to the jurisdiction of this honorable court, but on the contrary, insisting that it is without jurisdiction in the premises, and reserving the right to demur, plead, or answer in accordance with the rules of practice and procedure which obtain in this court, and solely in response and by way of a return to the rule to show cause, granted on the 21st day of January, 1908, 'why the relief prayed for in the said bill should not be granted and why a receiver should not be appointed by this court to take charge of and administer all of the funds now in the hands of said defendants arising from the sale of property belonging to the

State Dispensary or from the collection of any debts due it,' and for cause in this behalf these defendants say:

"(1) That the said plaintiff has not by and in said bill stated such a cause as doth or ought to entitle it to any such relief as is thereby sought or prayed for from or against these defendants, or either of them.

"(2) That it appears from the allegations contained in the complainant's bill that the said suit is a suit in fact and in legal effect against the state of South Carolina, and not against these defendants, or either of them, except as in their official capacity they represent said state, and therefore is contrary to the provisions of the eleventh amendment to the Constitution of the United States of America.

"(3) That it appears from the allegations in said bill that the said suit is a suit against the state of South Carolina, for that the purpose and intention thereof is to administer the funds and moneys belonging to the state of South Carolina and in the custody of its duly authorized agents, to coerce the state of South Carolina in the payment of the alleged debt of the plaintiff, and to restrain a duly constituted court of the state, in violation of section 720 of the Revised Statutes.

"(4) These defendants deny the allegations in paragraph 2 of the bill of complaint, and they aver that 'the manufacture, sale, barter, and exchange of intoxicating liquors was prohibited, and the state of South Carolina in the exercise of her police power engaged in and monopolized the liquor traffic, and to that end appointed and established the State Dispensary and appropriated $50,000 for commencing said business. Said dispensary, however, had no existence or entity or credit separate and apart from the said state. It was a mere agency of the state for the conduct and operation of her business. The business belonged to the state. All purchases therefor were made by the state and upon her credit. All profits of the business and the stock on hand at the time the State Dispensary was abolished belonged to the state.

"(5) Under the act creating the State Dispensary Commission, and in the exercise of the powers, rights, and the duties conferred upon said commission and these defendants by said act, and by the act approved January 24, 1906, these defendants closed out the entire business and property of the State Dispensary, except real estate, and collected a large part of the debts, and thus the fund in controversy was realized.

"(6) These defendants deny the averments contained in paragraph 10 of the bill of complaint, and say that said funds are not trust funds, and that these defendants do not hold or control the same, as trustees, either for the complainant or other alleged creditors of the state or for any one else. They aver that said funds are in their custody or control as officers of the state and at the will of the state, and are to be disposed of in accordance with the provisions of the act creating the commission, unless said act is amended or repealed. They further aver that the said funds are the property of the state of South Carolina, and are in the possession of the said state, as the control or possession of the said funds are in the defendants as the officers of the state, and their possession or control is the possession or control of the state.

"(7) They further aver that they, as individuals, have no interest whatever in the litigation or in the funds in controversy, and that their sole duty and liability with respect to said funds is to the state of South Carolina, to her General Assembly and Governor; that the claims of the plaintiff and all others for goods sold to the State Dispensary are against the state, and not against the State Dispensary, or against the State Dispensary Commission, or against these defendants, either in their official or individual capacity. Neither the State Dispensary Commission, nor these defendants, as officers or individuals, sustain any relation or privity to the plaintiff, contractual or otherwise. They owe no duty to, and are under no liability to, the plaintiff or to any other person holding claims of like character against the state.

"(8) These defendants further say that they have exercised the powers and authority granted by the General Assembly only for the purpose of enabling them to perform their duties fairly and promptly, and they submit that they have proceeded with the work with all possible expedition and dispatch. They requested the Attorney General and his associates to investigate and secure evidence as to the validity and justice of the various claims against the state.

From time to time they impressed upon said parties their desire to complete the work as soon as possible, and repeatedly urged the necessity of prompt action. It was not until within the last 30 days, however, that said parties reported that they had secured sufficient evidence and were ready to proceed with the hearing of all said claims. These defendants say, upon information and belief, that this report was made as early as practicable, as there was a large number of claims extending over a period of several years, and the evidence relative to the same was gathered from various states. Immediately upon receipt of this report, the commission assigned 41 of said claims for a hearing, and among these was plaintiff's claim. A docket was made up, copy of which will be shown to the court, and a notice was served upon the plaintiff and upon all others whose claims had been assigned for a hearing as stated. A formal notice was served upon the plaintiff, requiring it to produce certain of its books of original entry relating to its accounts against the state.

"(9) On the 14th day of January the commission commenced the hearing of said claims. It took up the claims of Ullman & Co. and of the Anchor Distilling Company. After hearing of evidence the commission reached the conclusion that, instead of the state being indebted to said claimant in the sum of $36,926.78, Ullman & Co. was indebted to the state in the sum of $31,390.72, and thereupon they returned a judgment in favor of the state against Ullman & Co. in accordance with their findings. A transcript of the evidence in said case and the copy of the judgment of the commission will be exhibited to the court.

"(10) Plaintiff's claim was assigned for January 23d. George B. Lester, Esq., general counsel for plaintiff, was present on January 14th and claimed an agreement with Mr. Stevenson that plaintiff's case would be heard that day. Before announcing ready to proceed, the counsel for the state demanded the production of the books covered by the notice served upon the plaintiff as aforesaid, and notified Mr. Lester that they desired the presence of one Early, who acted for the plaintiff in connection with sales to the state, and whom they desired to examine in connection with its claim. Thereupon the said George B. Lester stated that the plaintiff would decline to produce its books or have said Early present. He challenged the jurisdiction of the commission to enter upon a full investigation of all transactions between the plaintiff and the officials of the State Dispensary, and stated that he would appeal to the federal court for relief.

"(11) The commission is advised by the Attorney General and his associates that the claim of the plaintiff for goods sold by it to the State Dispensary is unjust and invalid and they have evidence to establish: (a) That the plaintiff and the Gerson-Seligman Company are one and the same, as the latter is a mere trade-name under which the former transacted business, and was used for the purpose of avoiding the provision of the statute which prohibits any person, firm, or corporation from submitting more than one bid. (b) That there existed between the plaintiff and Gerson-Seligman Company and its agents and representatives and a majority of the said members of the board of the South Carolina Dispensary a conspiracy to defraud and cheat the state of South Carolina, and in pursuance thereof the said plaintiff, by and with the aid and assistance of the said board of directors, or a majority thereof, did cheat and defraud said state of South Carolina by charging and collecting from said state prices for the goods sold to the state which were largely in excess of the market value thereof, which overcharges were by agreement between conspirators made and used for the purpose of corrupting and bribing the officials and agents of said state of South Carolina, to the end that the board of directors of the Dispensary might be induced to purchase the goods of said plaintiff at such excess prices, and the difference between the fair market value of the goods so sold by said plaintiff to the said state and the prices at which said goods were so purchased from the plaintiff was fraudulently and unlawfully employed by the plaintiff in bribing and corrupting the officials and agents of the said state, so that said state was cheated and defrauded out of a large sum of money in excess of the amount now claimed to be due by the plaintiff. (c) That the plaintiff did not comply with the law of the state of South Carolina relative to the sale and purchase by the state board of directors, in that they failed to comply with the provisions of said

law requiring that only one bid shall be made by any one; for said plaintiff and the said Gerson-Seligman Company, being in fact one and the same firm, did fraudulently and deceitfully pretend that they were separate firms, and did frequently make two or more bids at the same time to the Treasurer of said state for consideration by the state board of directors of the South Carolina Dispensary. (d) They failed to accompany their bids, or all of them, with the chemical analysis of the liquor offered for same. (e) They failed to furnish the bonds required by law to insure the compliance by them with the terms of the contract of purchase and sale between them and the State Dispensary. (f) That they violated said law, in that they constantly had agents, representatives, and solicitors in the state for the purpose of soliciting the purchase of their goods by said state, and that through its said agents and representatives soliciting business from said board of directors. (g) That the gross amount of sales made by the plaintiff and by said Gerson-Seligman Company to the state amounted in the aggregate to several hundred thousand dollars, and that in each of the said bills there were prices charged in pursuance of said conspiracy in excess of said fair market value. (h) That the plaintiff sold to the state the same brand of liquors of a lower proof at a price higher than it sold the same brand of goods of a higher proof to other parties. (i) That the plaintiff sold to the state as whisky an artificial whisky or concoction, made of spirits with a trace of whisky added to it. (j) That in pursuance of said conspiracy the advertisements for bids were illegal, in that the prices of the liquors to be furnished were fixed in the advertisements, and thus competition was prevented. (k) That upon a just accounting between the state and the plaintiff, the plaintiff will be indebted to the state in a considerable amount.

"(12) From the evidence already before the commission it is satisfied of the existence of a conspiracy to which some of the creditors and some of the board of directors were parties, but whether the plaintiff was a party thereto, and whether its claim is valid or invalid, and whether it should be paid in whole or in part, are matters to be determined, as these defendants are advised, after the commission has heard the evidence of both plaintiff and the state.

"(13) These defendants deny each and every allegation in the bill of complaint to the effect that these defendants had stated 'that there would be no further dispute as to the amount due' plaintiff, or that these defendants had admitted that there was due the plaintiff a balance of $66,501.19, or any other amount, or that they had agreed to pay plaintiff any amount whatever, or that 'the amount due [plaintiff] had been determined and agreed upon,' or 'that the amount claimed by [plaintiff] has been admitted by the defendants to be a just liability against the State Dispensary and now due and payable out of the fund in their hands,' or that 'the said defendants have never claimed or pretended that said amount was subject to any offsets, credits, or counterclaims.' Each and every of said averments are untrue.

"(14) Defendants deny the averment in said bill of complaint to the effect that plaintiff's account has been 'adjusted,' except to the extent that the books of the State Dispensary have been audited and the entries thereon have been brought into substantial agreement with the items of plaintiff's claim. There has been no determination or adjustment as to whether the items on said claim are proper and just charges against the state, nor whether the said claim is to be reduced in whole or in part by reason of offsets and counterclaims, nor whether said claim or any part thereof is illegal by reason of a noncompliance with the statutes of South Carolina, or by reason of frauds and conspiracies to which the claimant was a party, and, in short, for any of the reasons which the Attorney General and his associates contend they can establish by the evidence to which reference has been made. Moreover, defendants are advised that until final judgment all tentative conclusions or decisions, however solemnly announced, were subject to modification or reversal.

"(15) These defendants denounce as gratuitously false the charges in said bill of complaint 'that there has been formed and now exists an unlawful understanding or agreement between the defendants by which it has been decided that the money deposited in the banks above named shall be held and allowed to remain as long as possible in said banks, to be used by them for

their own benefit and profit,' and that the defendants 'are wrongfully and unlawfully retaining said money for the use and benefit of the institution in which they are personally interested, and are wrongfully and unlawfully refusing to carry out and perform the duties in trust imposed upon them.' The defendants aver that they deposited the funds received by them in 31 banks in the state of South Carolina, in which there is now on deposit to the credit of the State Dispensary Commission the aggregate sum of $706,599.82 on call and subject to check; that each and every of the said banks is sound and of undoubted solvency; that each and every of said deposits, with the exception of $16,505.59 on deposit with the National Loan & Exchange Bank as an active account, draw interest from the date the deposits were respectively made at 4 per cent. per annum, and are secured by state and municipal bonds and other solvent securities deposited by said banks with said commission as collateral security for the payment of principal and interest of said respective deposits, the market value of which is largely in excess of the deposits secured thereby. The defendants will exhibit to the court a list of the said banks with the amount deposited in each.

"(16) That in addition to said amounts deposited and secured as aforesaid the commission will hereafter receive about $100,000 on account debts due by various county dispensaries, which, when received, will in like manner be deposited and secured.

"(17) The defendants admit that some of them are stockholders and directors in some of the banks named, but they submit that each of the said banks was selected solely because of its recognized solvency and its willingness to secure the deposits with sufficient and satisfactory collaterals and to pay 4 per cent. interest thereon.

"(18) The commission offered $150,000 to the Carolina National Bank and the Bank of Columbia, both of which refused to collaterally secure the deposit, and for that reason the deposits were not made with them. The defendants are informed and believe that they could not have found banks, either in or out of the state of South Carolina, in which to deposit said fund, which would have received said deposits on safer or more favorable terms.

"(19) The defendants deny the allegations in paragraph 14, and aver that there is no difference between the members of the commission as to the method to be pursued in dealing with the creditors of the state for goods sold to the State Dispensary, and that the commission as a body is a unit on the following propositions, to wit: (1) To require all creditors whose claims are challenged by the counsel for the state to produce their books of original entry and their documents containing material evidence and to comply with all reasonable and proper requirements prescribed by the commission. (2) To hear all competent evidence presented by the creditors or by counsel for the state, and after a careful and judicial consideration thereof to determine what amounts are due by the state, and pay all claims which in their honest and impartial judgment are due by the state, and no others.

"(20) The defendants deny that it has been eight months since Commissioner Arthur has met with the commission. It is true that he has not attended the meetings of said commission since November. His physician wrote the commission that Mr. Arthur's absence from one or more of the meetings was because of his illness.

"(21) These defendants deny the allegations contained in paragraph 15 of the bill of complaint, and they denounce as gratuitously false and malicious the allegations in said paragraph that 'the defendants have entered into an unlawful combination or conspiracy with one J. Fraser Lyon, the present Attorney General of the state of South Carolina, and under whose advice said defendants are acting to aid the said Lyon in carrying out his frequent threats to prosecute and imprison said officers and to that end have agreed among themselves and with said Lyon to withhold the payment of the claim of your orator and all other creditors until the said Lyon has obtained such evidence as may be sufficient to prove the guilt and secure the conviction of said officers; that under and pursuant to this agreement, combination, or conspiracy the defendants have refused and are still refusing to carry out the provisions of the act of 1907.' The defendants aver that they withheld payment until the state could have an opportunity to collect the evidence with regard to said

claims, and after a regular and orderly hearing the commission could reach a fair decision as to the validity and justice of the various claims.

"(21a) It is further averred that after the hearing of the case of Ullman & Co. on the 15th day of January, 1908, the commission and the counsel for the state were then and there ready to hear and determine the other cases assigned in their regular order, but said cases were not heard because of the absence of some of the claimants and because of the failure of others to comply with the reasonable orders of the commission. Thereupon the commission assigned all of the remaining cases for hearing to be commenced on January 30th, and to continue from day to day until all of said cases have been finally disposed of. It is the purpose of said commission to hear and decide the cases in their order upon the calendar, and notices to this effect were sent the various claimants by registered mail, and unless prevented by the orders of this honorable court the commissioners will execute said purpose, and will pay each and every claim which shall be determined to be due and owing by the state.

"(22) It is further averred that the state is the owner of said funds, and should be sole defendant; at least, the state is an indispensable and necessary party. Defendants are advised that the state is not subject to suit, and cannot be the sole defendant, or the defendant at all, and that therefore the court is without jurisdiction; but they submit that, if it had jurisdiction, there is no necessity for the appointment of a receiver. The state authorized the commission to act in the premises, and these defendants have undertaken to discharge their duties fairly, promptly, and conscientiously. They submit that all the allegations and insinuations made in the bill of complaint charging neglect, delay, or improper or fraudulent conduct on the part of these defendants are unfounded and false, and they submit that they should be permitted to complete the work and discharge the responsibilities imposed upon them by the state.

"(23) These defendants demand strict proof of each and every allegation in the bill of complaint contained, except those herein specifically admitted to be true.

"(24) The defendants submit herewith a number of affidavits, and they pray that the same may be taken in connection with and as a part of their return; and, having fully answered, they pray to be hence discharged, with their reasonable costs in this behalf expended."

Upon the filing of the bill an order was issued by the Circuit Court of the United States for the District of South Carolina, requiring the respondents, to wit, the five dispensary commissioners heretofore named, to appear and show cause why a receiver should not be appointed and an injunction granted as prayed for by the complainants. On the return and answer of the said commissioners, and after a hearing, receivers were named by the Circuit Court to take charge of the fund in the hands of the respondents, and an injunction was also granted restraining said respondents from disposing of the funds in their hands, etc. From these decrees and orders, which were made in vacation, the respondents appealed to this court.

The positions relied upon chiefly by the appellants are that the Circuit Court is without jurisdiction in this case; and the basis of the position is that the suit is one against the state of South Carolina, and is prohibited by the eleventh amendment; that the dispensary was a state institution, and its operation part and parcel of the exercise of independent power by a sovereign state; that the present commissioners are officers of the state, and that the fund in their hands belongs to the state and, therefore, the state is not only a necessary, but an indispensable, party to any suit or judicial proceeding seeking the fund or any part of it; that the Dispensary Commission is a court of the state of South Carolina, and that the Circuit Court is forbidden by law to enjoin its proceedings; and, further, that the equities alleged in the bill are not sufficient to authorize an injunction and the appointment of receivers as prayed for. On the other hand, the appellees insist that the commissioners (appellants) are mere ministerial agents appointed under the provisions of the act of the South Carolina Legislature to dispose of the dispensary property, collect the debts due, and from the funds thus arising to

first pay off and discharge the just liabilities incurred in the operation of the dispensary in the purchase of supplies, etc., and the residue, if any, to pay to the state; that the fund in the hands of the appellants was there, by virtue of the law, for special purposes, the first of which was to pay the dispensary debts; and that the state has no interest save in the residue, if there be such, after the just debts are paid. In other words, the position principally maintained by the appellees is that the appellants, as commissioners acting under the authority of the act of the South Carolina Legislature, became and are trustees of a special fund, which they hold primarily for the specific purpose of paying the debts which had been incurred by the dispensary in the course of its operations; that the action of the appellants in refusing to adjust and pay the claims of the appellees was an abuse of trust, and was an arbitrary and illegal attempt to defeat complainants of their rights. The appellees say, therefore, that they sought relief in a court of equity, there being, under the circumstances, no adequate remedy at law, whereby they might have the just and true amounts of their claims ascertained and have the funds in the hands of the appellants applied in payment, as contemplated by the provisions of the law which created the commissioners and from which they derived their power to act.

B. L. Abney, W. F. Stevenson, and D. W. Rountree (Anderson, Felder, Rountree & Wilson, Abney & Muller, Stevenson & Matheson, and J. Fraser Lyon, on the briefs), for appellants.

T. Moultree Mordecai, Alfred S. Barnard, and Simeon Hyde (Frank Carter, H. C. Chedester, and Geo. B. Lester, on the briefs), for appellees.

Before FULLER, Circuit Justice, and WADDILL and BOYD, District Judges.

BOYD, District Judge (after stating the facts as above). When we have cleared away the immaterial matter and have divested this controversy of all save that which relates to the substance of it, there remains to be considered two main propositions. The first is jurisdictional, and presents the question whether this action is against the state of South Carolina, and, therefore, forbidden by the eleventh amendment to the Constitution of the United States; the second, whether the Dispensary Commission, against the several members of which this suit is brought, is a court of the state of South Carolina and, therefore, incapable of having its proceedings stayed by writ of injunction granted by a court of the United States. Section 720, Rev. St. (U. S. Comp. St. 1901, p. 581). To these two may be added another, which relates particularly to the bill and the testimony offered by the complainant in support; the appellants having set up, as a part of their answer, that the bill and the testimony are insufficient to authorize an injunction and the appointment of receivers pendente lite. The principles involved in the first proposition, however, are paramount; and following closely, as affecting the right of the complainant to maintain this action and the jurisdiction of the court to entertain it, is the second proposition.

Is this a suit against the state of South Carolina, or is the purpose of the action and the disposition sought to be made of the subject-matter of such nature as to render the state an indispensable party? In other words, does the state hold the money which the complainant

undertakes to subject to the payment of his debt in its sovereign capacity, as a part of its public fund for its use in supporting and carrying on the state government? Undoubtedly the eleventh amendment was intended to prevent a federal court, in suits prosecuted by citizens of another state or citizens or subjects of a foreign state, from interfering with a state in the preservation of its autonomy, in maintaining its own system of self-government, so long as such system is in harmony with the Constitution of the United States. To this end, therefore, the funds of the state, in its treasury, or held by its officers or agents, for use in the administration of the governmental affairs of the state, are not to be affected by the process of a federal court; nor can such court entertain jurisdiction of an action which has for its purpose the invasion of the right of the state to manage and control its internal affairs, or of an action which will obstruct the state authority or impair the state instrumentalities in the discharge of legitimate functions in the maintenance of the state's integrity. To be more concise, the constitutional inhibition is to the effect that the courts of the United States cannot entertain jurisdiction in an action at the instance of a citizen which seeks to recover as against the state the property belonging to the state, or the purpose of which is, and the result of which would be, to disturb the legal and orderly administration of the state's internal governmental affairs by its duly appointed officers and agents.

Does this case come within the limits prescribed? In this connection it becomes necessary to inquire if the state has any present interest in the fund in controversy, which can be divested by a judicial determination of the true amount, if any, justly due the complainant. Or has the state by an act of the Legislature relinquished all right, if any existed, to enough of the fund to pay all the just debts contracted by the dispensary authorities? If so, can the ascertainment of the true amount of these debts and the application of the funds in the hands of the commissioners in payment affect the right of the state, or in any way interfere with the authority of the state, to manage and control its internal government within the bounds of its legitimate autonomy?

The first proposition presented to us rests largely upon the construction to be given to the act of the South Carolina Legislature, approved February 16, 1907. Sess. Laws 1907, p. 835. This act provides that:

"The Governor shall appoint a commission of well-known business men of five members, * * * to be known as the State Dispensary Commission."

"Said commission shall immediately organize by the election of a chairman and a secretary from their number."

"It shall be the duty of said commission to close out the entire business and property of the State Dispensary, except real estate, including stock in the several county dispensaries, by disposing of all goods and property connected therewith, by collecting all debts due and by paying from the proceeds thereof all just liabilities at the earliest date practicable."

By section 47 of another act passed by the South Carolina Legislature on the 16th of February, 1907 (Sess. Laws 1907, p. 480), the

dispensary as a state institution was abolished; the enactment to that end being as follows:

"The State Dispensary is hereby abolished and all acts or parts of acts inconsistent with this act are hereby repealed."

Then came the other act of February 16, 1907, creating the commission and from which we have quoted above. This act bears the title:

"An act to provide for the disposition of all property connected with the State Dispensary and to wind up its affairs."

Thus we see that the state determined to go out of the business of dealing in liquors, and through its Legislature repealed the law under which it had operated, and by another act assigned all of the property, estate, and effects belonging to or connected with the dispensary to the Dispensary Commission, to be reduced to cash and from the proceeds first to pay all just liabilities. From this source the fund now in the hands of the commission arose. The state, through its Legislature, has passed both the title and possession of the fund involved to the commission for the purposes designated in the act, the first of which is to pay all outstanding just liabilities which had been incurred by the State Dispensary in the course of its operations. The fund being in the hands of the commission charged with this duty, the state has no interest in so much thereof as is necessary to pay the just debts. Then how can it infringe any right of the state to have the true amount of the debts due by the defunct dispensary judicially ascertained?

In Bank of United States v. Planters' Bank of Georgia, 9 Wheat. 904, 6 L. Ed. 244, which was a suit brought in the Circuit Court of the United States, the question of jurisdiction, in view of the eleventh amendment to the Constitution, is discussed. The action was founded on promissory notes payable to a person named therein, and were duly transferred, assigned, and delivered to the plaintiff. A plea was entered by the defendant to the jurisdiction of the court on the ground that it was a corporation in which the state of Georgia, and certain individuals, who were citizens of the same state, were stockholders, and the point made by the defendant was that, the state of Georgia being a stockholder, the action was forbidden by the eleventh amendment. In delivering the opinion Chief Justice Marshall uses this language:

"This suit is not to be sustained because the Planters' Bank is suable in the federal courts, but because the plaintiff has a right to sue any defendant in that court who is not withdrawn from its jurisdiction by the Constitution or by law. The suit is against a corporation, and the judgment is to be satisfied by the property of the corporation, and not by that of the individual corporators. The state does not, by becoming a corporator, identify itself with the corporation. The Planters' Bank of Georgia is not the state of Georgia, although the state holds an interest in it. It is, we think, a sound principle that when a government becomes a partner in any trading company it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and prerogatives, it descends to the level of those with whom it associates itself, and takes the character which belongs to its associates and to the business which is to be transacted."

164 F.—2

In the case of Governor of Georgia v. Madrazo, 1 Pet. 110, 7 L. Ed. 73, in the course of an opinion delivered by Chief Justice Marshall, it is said:

"In United States v. Peters [3 Dall. 121, 1 L. Ed. 535] the court laid down the principle that, although the claims of a state may be ultimately affected by the decision of a cause, yet if the state be not necessarily a defendant, the courts of the United States are bound to exercise jurisdiction."

In the case of Pennoyer v. McConnaughy, reported in 140 U. S. 1, 11 Sup. Ct. 699, 35 L. Ed. 363, very clearly drawn is the distinction, in suits brought against officers or agents of a state, as to when the jurisdiction of the Circuit Courts of the United States may be maintained and when such jurisdiction cannot. In the course of the opinion in this case the court, speaking through Mr. Justice Lamar, says:

"The first class is where the suit is brought against the officers of the state as representing the state's action and liability, thus making it, though not a party to the record, the real party against which the judgment will so operate as to compel it to specifically perform its contract."

Suits within this class are forbidden. The court further says:

"The other class is where the suit is brought against defendants who, claiming to act as officers of the state and under the color of an unconstitutional statute, committed acts of wrong and injury to the rights and property of the plaintiff acquired under a contract with the state. Such suit whether brought to recover money or property in the hands of such defendants unlawfully taken by them in behalf of the state, or for compensation in damages, or in a proper case where the remedy at law is inadequate for an injunction to prevent such wrong and injury, or for a mandamus in a like case to enforce upon the defendant the performance of a plain, legal duty, purely ministerial, is not, within the meaning of the eleventh amendment, an action against the state."

Suits within this class are not forbidden.

In the case of Swasey v. N. C. Railroad Company, 23 Fed. Cas. 518 (No. 13,679), the state of North Carolina had issued bonds for the construction of the North Carolina Railroad. The state took stock in the North Carolina Railroad Company to the amount of the construction bonds so issued. The act under which the bonds were issued pledged the stock which the state held in the company for the payment of the bonds. The bondholders brought a suit in the Circuit Court of the United States for the District of North Carolina, seeking to subject the stock to the payment of overdue bonds and also accumulated interest. It was contended that the state of North Carolina was an indispensable party to this suit on account of its interest in the result, and that, therefore, the suit was forbidden by the eleventh amendment; but the court said:

"If a state could be brought into court, it undoubtedly should be made a party before a decree is rendered; but since the case of Osborne v. Bank, 9 Wheat. 739, 6 L. Ed. 204, it has been the uniform practice of the courts of the United States to take jurisdiction of cases affecting the property of a state in the hands of its agents without making the state a party, when the property or the agent is within the jurisdiction. In such case the court acts through the instrumentality of the property or the agent."

Another case following in the same line is that of Chaffraix v. Board of Liquidation et al. (C. C.) 11 Fed. 638, in which it is held that:

"The Circuit Court has jurisdiction to prevent by injunction the officers of a state from diverting a fund collected by taxation and set apart under a statute of that state to pay certain bonded indebtedness of said state, to the end that said fund may be preserved intact until the rights of the parties and interests of the state, if any she has, may be determined contradictorily. Such action is not forbidden by the eleventh amendment to the Constitution of the United States, and is necessary for the proper enforcement of section 10 of article 1 of the same instrument."

In the case of Tindal v. Wesley, reported in 167 U. S. 204, 17 Sup. Ct. 770, 42 L. Ed. 137, the Supreme Court further emphasizes the distinction we are discussing. That was a suit by citizens of New York against citizens of South Carolina to recover the possession of certain real property in the latter state, with damages for withholding possession. One of the defendants in his answer stated that he had no personal interest in the property, but as Secretary of State of South Carolina had custody of it and was in possession only in that capacity. The other defendant stated that he was watching, guarding, and taking care of the property under employment by his co-defendant. Both defendants disclaimed any personal interest in the property, and averred that the title and right of possession was in the state. It was held in that case, Mr. Justice Harlan delivering the opinion of the court:

"That the suit was not one against the state within the meaning of the eleventh amendment to the Constitution of the United States."

And it was held, further:

"That a suit against individuals to recover the possession of real property is not a suit against the state simply because the defendant holding possession happens to be an officer of the state and asserts that he is lawfully in possession on its behalf. The eleventh amendment gives no immunity to officers or agents of a state in withholding the property of citizens without authority of law," etc.

Further in this decision the court says:

"Of course, it was competent for the defendants to prove that the lots in question belonged to the state, and in that way defeat the present action. So it would have been competent for the state, if it claimed the property, to have intervened and submitted to the jurisdiction of the court, to have obtained a judicial determination of the claim asserted for it by the defendants. But it did not intervene. It refused to do so."

The court goes still further, and refers to the case of South Carolina v. Wesley, 155 U. S. 542, 15 Sup. Ct. 230, 39 L. Ed. 254, stating:

"It appears that the state, by its Attorney General, suggested to the court that these lands were held, occupied, and possessed by the state through and by its officer and agent, and were used for public purpose; and without submitting the rights of the state to the jurisdiction of the court, but respectfully insisting that the court has no jurisdiction of the subject in controversy, it moved that the proceedings be dismissed. That motion was overruled, and the writ of error sued out by the state was dismissed; the Chief Justice observing: 'The state does not complain that it was refused leave to intervene, but that the Circuit Court, without the intervention of the state, refused mere-

ly upon suggestion to dismiss the complaint against the defendants who were sued as individuals. The state was not a party to the record in the Circuit Court, and did not become a party by intervention pro inter esse suo or otherwise, but expressly refused to submit its rights to the jurisdiction of the court.'"

U. S. v. Lee, 106 U. S. 196, 1 Sup. Ct. 240, 27 L. Ed. 171 and Georgia v. Jesup, 106 U. S. 458, 1 Sup. Ct. 363, 27 L. Ed. 316, are also cited.

It will be found that the doctrine declared in the several cases, as above recited, is reiterated in the case of Gunter, Attorney General, etc., v. Atlantic Coast Line, 200 U. S. 273, 26 Sup. Ct. 252, 50 L. Ed. 477.

But we deem it unnecessary to cite further authorities upon the position we are presenting, for upon examination of the cases we have mentioned it will be found that other cases bearing upon the point are referred to. We will, however, call attention to the most recent case involving the principle, and that is in the matter of Edward T. Young, petitioner on petition for writ of habeas corpus and certiorari, decided during the last term of the Supreme Court. 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932. This case arose in the state of Minnesota and was a suit in equity brought by a certain railway company to restrain the Attorney General and other officers of the state from enforcing a law which had been passed by the Minnesota Legislature imposing penalties upon railroad corporations and officers of such corporations for violating freight rates provided under the state law. The Attorney General of the state of Minnesota, who is the petitioner in the case, relied upon the position that the proceeding by the railroad was a suit against the state and forbidden by the eleventh amendment. The Supreme Court, Mr. Justice Peckham delivering the opinion, held that, as the act of the Legislature in question was unconstitutional, the Attorney General and other officers of the state who undertook to enforce it to the injury of the railroad were not protected by the eleventh amendment; that the suit was not one against the state, but against the Attorney General and other officers named, to restrain them from enforcing an unconstitutional act of the Legislature.

In what capacity, therefore, are the members of the commission acting? Are they officers of the state of South Carolina, discharging a duty in behalf of the state, or are they agents appointed under the act of the Legislature of the State, empowered to take possession of a certain fund and directed to administer such fund in a particular manner? In other words, does the act creating the commission and authorizing the appointment of the several members who compose it confer upon them any powers in connection with the administration of the state's affairs, or are they by the terms of the act holders of a special fund intrusted to them for the prime purpose of paying off and discharging the State Dispensary debts? We are constrained to hold that the fund in their hands is, by virtue of the provisions of the act, held in trust for the payment of the debts mentioned, and that the creditors of the State Dispensary have a property in the fund in the hands of the commission, to the extent that the debts are shown

to be just, and that a judicial determination of the true amount of such debts can in no way affect the rights or interests of the state; the only interest of the state in the fund being, as declared by the act, the residue after the just liabilities of the State Dispensary are paid, and this interest is subordinate to the payment of the said liabilities. It is elementary that particular formality is not required in the creation of a trust. If any agreement or contract in writing is executed by one having the power to dispose of property, whereby it is directed that particular property or fund shall be held or dealt with for a special purpose for the benefit of another, in such case equity raises a trust in favor of the beneficiary. The right to create a trust for specific purposes is not confined to individuals or private parties; but we find in Perry on Trusts, § 30:

"That a state, by its legislation, or by its public officers, duly authorized, can create a trust, convey property, and appoint trustees."

The provisions of the act creating the Dispensary Commission are strikingly similar in substance to the usual form of conveyances of property in trust for the benefit of creditors. There are the necessary three parties—the trustor, the trustees, and the cestui que trusts. The state, acting through the Legislature, passes the title and possession of certain property to the five appellants, who are constituted a Dispensary Commission. The direction is that the appellants take this property, sell it, collect debts, and, when the proceeds are in hand, pay off the just liabilities of the State Dispensary. The act then provides for the payment of certain expenses incident to the discharge of the duties devolving upon the commission, and after that the residue to be paid to the state. We undertake to say that there is scarcely to be found recorded anywhere an assignment by a debtor for the benefit of creditors more intelligently constructed or more readily understood. Having, therefore, determined the relation of the appellants to the fund in controversy, we answer the question propounded in the outset that this is not a suit against the state and that complainant is not forbidden to maintain his action by the eleventh amendment to the Constitution of the United States. The appellants are in possession of the fund which complainant is seeking to recover on the ground that it has been set apart and placed in the hands of the appellants to pay a debt which is justly due him. The state of South Carolina does not intervene to assert any right to this fund or to have any interest which the state may have in it determined; but the appellants themselves raise the question of the jurisdiction of the court, basing it upon the allegation that the property in their hands belongs to the state. We think, in view of the facts in this case, upon the authorities heretofore cited, and especially under the case of Tindal v. Wesley, supra, the appellants are not entitled to avail themselves of that defense.

This suit is not against the state, nor is the state an indispensable party. Treating the fund in the hands of the appellants as a trust fund, and the duties of the trustees in regard thereto being clearly defined, the trustor is not even a necessary party to the suit brought to compel the trustees to discharge their said duties. However, if the

state elects, it may intervene and have a judicial determination as to any right it may claim. To conclude, therefore, as to the first proposition, it is our opinion that the Circuit Court has jurisdiction of this case and that the same is cognizable in a court of equity. It is the peculiar province of courts of equity to administer trusts. Indeed, it is a familiar saying that "equity loves a trust," and that it will not permit a trust to fail for the want of a trustee. In a court of equity, which is a forum of conscience, the shortcomings of the law can be supplied, and every interest and right can be protected and administered, so as to insure exact justice. The proceedings in these courts are of such character as to be most conducive to the ascertainment of truth, and, besides this, a chancellor may, if he deems it expedient, be aided in determining a difficult issue of fact by calling to his assistance a jury on the law side of the docket.

It is insisted that the claims involved in this controversy, if due, are debts of the state, and appellants say that they represent the state, which is the real party in interest; yet in this situation they contend that, in case of a dispute as to the validity of any of the claims, it should be left to them to decide. In other words, their position appears to be that the agents and representatives of the debtor should constitute a tribunal, absolute in its character, to arbitrarily pass upon what, if anything, is due an alleged creditor, and if a claim be adjudged invalid to put an end to it, without further opportunity for redress on the part of the creditor. To uphold such contention would, in our opinion, in the event that a just debt due a creditor was thus rejected, deprive such creditor of his property without due process of law.

This case presents itself in another aspect, which, to say the least, is somewhat novel, and which, if other attending conditions were different, might affect the right of the state to avail itself of the provisions of the eleventh amendment. We feel justified in assuming that in the conception and adoption of the eleventh amendment it never entered the mind that a sovereign state would engage in business as a liquor dealer and become a trader by buying and selling an article of common traffic in competition with the citizens of the country. It may be questioned, therefore, whether the state of South Carolina, in becoming such dealer, was exercising a governmental prerogative or performing a function necessarily or properly incident to its autonomy as a state. It is not our purpose to venture an opinion in respect to this question, for, in view of what we have said before, it is not necessary to the disposition of the case, and then we have no authority in point to guide us. We will, however, recall, as having some bearing on the question, the following quotation from Bank of United States v. Planters' Bank of Georgia, supra:

"It is, we think, a sound principle that, when a government becomes a partner in any trading company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen."

And we may also refer to South Carolina v. United States, 199 U. S. 437, 26 Sup. Ct. 110, 50 L. Ed. 261. In this case the Supreme

Court passed upon the right of the United States government to require the South Carolina dispensaries to pay the privilege tax as liquor dealers. The contention was there, as here, that the dispensary was a state institution, and, therefore, not subject to tax by the federal government. Mr. Justice Brewer, after citing a number of cases, in the course of the opinion which he delivered for the court, uses this language:

"These decisions, while not controlling the question before us, indicate that the thought has been that the exemption of state agencies and instrumentalities from national taxation is limited to those which are of a strictly governmental character and does not extend to those which are used by the state in the carrying on of an ordinary private business."

These declarations by the highest court of the nation will at once suggest the inquiry, if the dispensary was not an instrumentality of the state's government in one respect, can it be such in any other?

The second proposition is whether the State Dispensary Commission, provided for in the act of February 16, 1907, is a court of the state of South Carolina, and, therefore, cannot be enjoined because of the provisions of section 720 of the Revised Statutes of the United States. We scarcely deem it necessary to enter into an elaborate discussion of this question, for what is said by us before practically disposes of it. However, a perusal of the act creating the commission will at once repel the argument that it is, in any sense, a court. The Constitution of South Carolina provides for courts as follows: First, a court for the trial of impeachments; second, a Supreme Court; third, a court of common pleas and general sessions; fourth, a probate court; fifth, courts of magistrates; and, sixth, such other inferior courts as the General Assembly may, from time to time, in their wisdom establish. There is nothing in the act creating the commission which suggests that the Legislature contemplated that it was to be a court. It is certainly not one of the courts provided for by the Constitution, as above set forth; nor does the act declare that it is a court of an inferior character. No method of procedure is provided, such as is usual in a court. The commission has no power to enter a judgment or enforce any mandate by process. It is true that by virtue of the act the commissioners are authorized to investigate transactions connected with the management and control of the State Dispensary anterior to the time that it was abolished, and to ascertain if there had been fraudulent practices on the part of the dispensary agencies in connection with the purchases of liquors, and report their actings and doings to the Governor; but they were not empowered by the act to determine any issue of fact, enter any judgment, or conclude any party that might be investigated as to any right or interest involved. The only element of discretion given to the commissioners which we can find at all in the act is in section 3, where, after providing that the commissioners shall sell the property and collect the debts, and pay from the proceeds thereof all just liabilities, etc., there is the following:

"Said commission shall be at liberty to make such disposition upon such terms, times and conditions as their judgment may dictate."

This can be construed to refer only to sales of the property. In every other respect the duties which devolve upon the commissioners are purely ministerial. It is our opinion, therefore, that the contention that the Dispensary Commission is a court is not well founded.

The proposition that complainant's bill and the testimony in support of it are insufficient to authorize a decree for injunction and receivers pedente lite can be readily disposed of. The bill alleges a just debt still existing and unpaid for liquors sold to the dispensary authorities by complainant. It is further alleged that said debt has been audited by the agency employed by the appellants, and has been found to correspond with the entries upon the books kept by the State Dispensary board, and, further, that the appellants refuse to pay complainant's debt from the funds in their hands set apart for that purpose. If these allegations are true, the complainant has the right to invoke the aid of the court. The appellants, in their return to the order to show cause, in paragraph 11, substantially deny the validity of the complainant's debt in the following language:

"The commission is advised by the Attorney General and his associates that the claim of the plaintiff for goods sold by it to the State Dispensary is unjust and invalid, which they have evidence to establish."

This is a practical admission that the appellants did not intend to pay complainant's debt from the fund in their hands. His only recourse, therefore, was by an appeal to a court of competent jurisdiction to determine as to whether or not his debt was just, and, if so, to require the appellants to pay it from the fund in their hands for that declared purpose, and also to have the fund preserved, to that end. So we dismiss that part of the case without further consideration.

Since the commencement of this action and the decision of the Circuit Court of the United States for the District of South Carolina that it had jurisdiction, and the issuing of an injunction and appointment of receivers as prayed for in complainant's bill, the Supreme Court of South Carolina, in a case brought before it, has rendered a decision construing the South Carolina statute involved in this controversy, and holds that a suit against the Dispensary Commission (the appellants in this case) is a suit against the state of South Carolina, and, therefore, forbidden by the eleventh amendment. The South Carolina Supreme Court is entitled to, and has, our most profound respect; but under the circumstances we do not feel at liberty to adopt the construction given by that tribunal to the South Carolina statute after the rights of complainant have accrued, and after he has sought his remedy in a Circuit Court of the United States, which has given a construction to the statute contrary to the decision subsequently rendered by the Supreme Court of the state. The law governing us is well settled in the case of Burgess v. Seligman, 107 U. S. 33, 2 Sup. Ct. 10, 27 L. Ed. 359, in which it is held:

"We do not consider ourselves bound to follow the decision of the state court in this case. When the transactions in controversy occurred, and when the case was under the consideration of the Circuit Court, no construction of the statute had been given by the state tribunals contrary to that given by the Circuit Court. The federal courts have an independent jurisdiction in the administration of state laws, co-ordinate with, and not subordinate to, that

of the State courts, and are bound to exercise their own judgment as to the meaning and effect of those laws. The existence of two co-ordinate jurisdictions in the same territory is peculiar, and the results would be anomalous and inconvenient, but for the exercise of mutual respect and deference. Since the ordinary administration of the law is carried on by the state courts, it necessarily happens that by the course of their decisions certain rules are established, which become rules of property and action in the state and have all the effect of law, and which it would be wrong to disturb. This is especially true with regard to the law of real estate and the construction of state Constitutions and statutes. Such established rules are always regarded by the federal courts, no less than by the state courts themselves, as authoritative declarations of what the law is. But, where the law has not been thus settled, it is the right and duty of the federal courts to exercise their own judgment, as they always do in reference to the doctrines of commercial law and general jurisprudence. So, when contracts and transactions have been entered into and rights have accrued thereon under a particular state of the decisions, or when there has been no decision, of the state tribunals, the federal courts properly claim the right to adopt their own interpretation of the law applicable to the case, although a different interpretation may be adopted by the state courts after such rights have accrued."

And in the case of Pease v. Peck, 18 How. 595, 15 L. Ed. 518, we find the following principle laid down:

"When the decisions of the state court are not consistent we do not feel bound to follow the last, if it is contrary to our own convictions; and much more is this the case where, after a long course of consistent decisions, some new light suddenly springs up, or an excited public opinion has elicited new doctrines, subversive of former safe precedent. Cases may exist, also, when a cause is got up in a state court for the very purpose of anticipating our decision of a question known to be pending in this court. Nor do we feel bound in any case in which a point is first raised in the courts of the United States, and has been decided in a Circuit Court, to reverse that decision contrary to our own convictions, in order to conform to a state decision made in the meantime. Such decisions have not the character of established precedent declarative of the settled law of a state."

It is our conclusion, therefore, that the decree of the Circuit Court for the District of South Carolina, appealed from, should be affirmed. The case will be remanded, to be further proceeded with in accordance with the views herein expressed.

Affirmed.